IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE: : NO. 3:08-MC-164

ABDEL FATTAH : (JUDGE CAPUTO)

**MEMORANDUM ORDER**

On June 20, 2008, I issued an Order authorizing Prime Care Medical, Inc. to assure that Abdel Fattah, an inmate at York County Prison under the jurisdiction of ICE, receives adequate nutrition and hydration since his refusal to eat and drink posed an imminent danger to his health. (Doc. 2.) As a part of that Order, I also authorized the use of "any necessary emergency life sustaining medical care, including the forcible use of a nasal-gastric tube or injection to medicate, hydrate and feed . . . Abdel Fattah until such time he is no longer a medical risk." (*Id.*) Judge Rambo of this Court entered a similar Order on June 20, 2008, in response to a petition from the United States on behalf of the Immigration and Naturalization Service. (Doc. 2, 1:MC-08-165.) The two cases were consolidated by Order of June 23, 2008. (Doc. 4.)

I held a hearing on June 24, 2008, at which Mr. Fattah indicated he wished to be represented by counsel, and thereafter counsel was appointed. The hearing was continued to July 1, 2008.

At the hearing on July 1, 2008, Mr. Fattah was present with counsel. The petitioner presented Jennifer Miosi, the Director of Nursing at York County Prison. She is in charge of Mr. Fattah's condition. She testified she was familiar with hunger strikes, that Mr. Fattah

arrived at York County Prison on June 17, 2008, that he would not submit to a physical examination, that he would not permit the taking of his vital signs, and that he did not want food. Mr. Fattah was placed on suicide watch which means that every fifteen (15) minutes he is observed by a corrections officer, every eight (8) hours he is evaluated by medical staff, once a day he is seen by a mental health counselor, and every eight (8) hours he is asked to undergo a physical examination.

She testified she tried to get Mr. Fattah involved with medical staff on June 18 and 19, but he refused. He also continued to reject food and water. Mr. Fattah told her that he could not remember when he last ate and drank.

The evidence is that a lack of water causes an imbalance in electrolytes and potassium. These deficiencies can have serious negative impact on the heart, kidneys and liver. Indeed a blood test revealed lower than normal electrolytes, lower than normal glucose and elevated liver enzymes. After feeding and hydration pursuant to the June 20, 2008 Order, all of these tests improved and in most instances returned to or approached normal.

Since June 23, 2008, the nasal-gastric tube feeding method has been used. Mr. Fattah has resisted this procedure in that he is able to close off the passage in his throat making it difficult to insert the tube into his stomach. It normally takes two (2) minutes to place the tube, but because of Mr. Fattah's constricting his throat, it takes twenty (20) minutes.

The feeding through the nasal-gastric tube has been successful. Mr. Fattah's appearance has improved as have his blood tests. This method is not without negative impact. The nasal passages become irritated and swell, and the throat suffers from the same conditions. Using this method for more than a year is not a good practice, but on a

short term basis it is effective and the results outweigh any discomfort.

There is an alternative to feeding someone like Mr. Fattah, and that is the J-Tube. The J-Tube is inserted by means of a surgical procedure which requires an incision and sutures; it is a larger tube and can be used for an indefinite period. It is subject to infection and simple removal by a patient who simply does not want it. The J-Tube is not considered a viable alternative because Mr. Fattah is under an Order of Removal from the United States to Egypt, and the plan is that he be fed until he is strong enough to travel. An attempt was made to place him on a plane prior to these proceedings, but he was apparently disruptive and uncooperative. Long term incarceration at York County Prison is not seen as a reality and thus the J-Tube is not considered a sensible alternative, not to mention the prospect that, because of his refusal to receive nutrition and hydration, he is a candidate to remove the J-Tube.

Mr. Fattah testified that for the past six (6) years he has not been eating. In 2001 or 2002, as a protest to a conviction because of a fight with a neighbor, Mr. Fattah began a hunger strike. He said he was well versed on the subject of hunger strikes because he had studied the subject. While he says he is not now on a hunger strike, he was unclear on when he ceased to be on one. Moreover, he gave vague conflicting testimony on why he does not eat or drink. He said he wanted to die; that he was dying; that his body was breaking down; that his stomach cannot handle that food; that he wants to be healthy; that he wants to go back to Egypt, but not in his current unhealthy condition; and that he only has to stay in jail five and one-half (5 1/2) more months and then will be free. He also testified he wants psychological counseling, but he is not satisfied with the medical health counselor at York County Prison.

Mr. Fattah is sending mixed signals. I am concerned with his inability to say when the hunger strike stopped, his inability to explain why he will not eat or drink, and his reluctance to cooperate with the nasal-gastric feeding. In addition, there is evidence that Mr. Fattah did drink water in his cell, although he denies he actually drank, noting instead he was simply wetting his mouth.

Mr. Fattah indicated he would like the insertion of the J-Tube. The court will not direct a particular methodology of feeding. I will leave that to the medical professionals.

Based on the foregoing, it is difficult to determine what Mr. Fattah is doing or what he wants. While these things would be helpful to know, what is known is that he will not eat voluntarily and that his health has and will suffer as a result. It is also known that his removal is imminent, and a long term method of feeding him involuntarily does not appear indicated, but that decision is but left to the medical professionals on the basis of this record and the fact that the negative side effects of the use of the nasal-gastric tube are, at present, outweighed by the benefit of the nourishment to Mr. Fattah's physical condition.

**I. First Amendment**

Force-feeding can implicate constitutional rights, including a First Amendment right to expression. However, Mr. Fattah cannot challenge his force feeding on these grounds. As held in *In re Soliman*, 134 F. Supp. 2d 1238 (N.D. Ala. 2001), Mr. Fattah's First Amendment right to expression is subject to a reasonableness inquiry. Because there is a valid rational connection between the force feeding and the legitimate government interest in preserving life, there are alternative means of expression, the accommodation of the expression would have negatively impact prison staff, inmates, and resources, and force

feeding is a not an exaggerated response to prison concerns, any First Amendment defense fails.

In *Soliman,* the District Court for the Northern District of Alabama considered an alien's petition for writ of habeas corpus with respect to his indefinite detention and his force-feeding. The court had previously entered an order to force feed and provide nonconsensuual medical treatment. *Id.* at 1240. The petitioner Soliman filed a motion for the court to reconsider the order. *Id.* Soliman had been ordered removed from the United States, and went on a hunger strike following a 90-day period in detention. *Id.* at 1245.

The court considered the constitutionality of force feeding INS detainees, including whether Soliman had a First Amendment right not to be force fed. *Id.* at 1252. The court used the Eleventh Circuit Court of Appeals case, *Hakim v. Hicks*, 223 F.3d 1244 (11th Cir. 2000) to discuss the level of scrutiny that applies to prison regulations. The Eleventh Circuit Court of Appeals described the standard as a "reasonableness" inquiry, requiring a determination of: (1) whether there is a valid rational connection between the regulation and a legitimate government interest, (2) whether there are alternative means of exercising the constitutional right, (3) whether and the extent to which accommodation of the asserted right would have an impact on prison staff, inmates, and resources, and (4) whether the regulation represents an exaggerated response to prison concerns. *Id.* (citing *Turner v. Safley*, 482 U.S. 78 (1987)).

The *Soliman* court noted that the government presented three (3) interests in force feeding Soliman. 134 F. Supp. 2d at 1252. These concerns were: (1) maintenance and security of operations within the facility, (2) preservation of his life and (3) the administrative

costs and burdens of the hunger strikes. *Id.* In light of these three (3) interests, the court found the practice of force feeding to be reasonable. In the case of Mr. Fattah, the same concerns exist on the part of the United States.

*1. Rational Connection Between the Practice and the Interest*

The *Soliman*, court noted that there was a valid, rational connection between force feeding Soliman and the government's interest in preserving his life. *Id.* Specifically, the court noted that the only way to preserve the life of a person on a hunger strike is to force feed that person. The court held that if the government allowed Soliman to die, other inmates would infer that the government was indifferent to their well-being, which in turn would likely incite disorderly conduct. *Id.*

The same concerns exist in the case of Mr. Fattah. Mr. Fattah refuses to eat or drink of his own accord. Therefore, the only way to preserve his life is through force feeding. Furthermore, there is a concern that allowing Mr. Fattah to starve could negatively affect the other inmates in the York County Prison.

*2. Alternative Means of Exercising First Amendment*

Soliman had alternative means of protesting his detention, as he was permitted correspondence with the outside world, including the ability to make telephone calls and be in contact with the media. *Id.* Therefore, the court held that Soliman had alternative means of expression, other than a hunger strike. *Id.*

There is no evidence as to Mr. Fattah's ability to contact the outside world. However, he does have communication with other persons in the York County Prison, including the staff. Therefore, Mr. Fattah does have some alternative means of expression.

*3. Impact on Prison Staff, Inmates, and Resources*

The *Soliman* court then considered the extent to which the accommodation of a First Amendment right to engage in a hunger strike would have an impact on prison staff, inmates, and resources. *Id.* at 1253-54. The court held that there would be an onerous administrative burden if Soliman was permitted to continue on his hunger strike. *Id.* at 1254.

Mr. Fattah's refusal to take food or drink has had an impact on prison staff and resources. He was sent to the emergency room prior to this Court's Order authorizing life sustaining care. Without such an order, Mr. Fattah may require further hospitalization and care, which would directly affect the prison staff and resources. Furthermore, the other inmates at the institution would be affected by Mr. Fattah's condition. They would see the hospitalizations and deterioration of Mr. Fattah's condition if he were not force fed.

*4. Exaggerated Response*

Finally, the *Soliman* court considered whether force feeding would constitute an exaggerated response to penal concerns. *Id.* The court found force feeding to not be an exaggerated response, as the practice is the only way to sustain the life of a prisoner on a hunger strike. *Id.* But, the court noted that the method employed in force feeding a prisoner could be determinative. *Id.* The government in *Soliman* used a nastrogastric tube, which the court stated is the preferred method of force feeding, and would not be an exaggerated response. *Id.*

Mr. Fattah has been fed both by nasal-gastric tube and by intravenous methods. These force feedings are the only way of sustaining Mr. Fattah's life. Furthermore, the use of the nasal-gastric tube and intravenous lines are not exaggerated, as these are not the

most intrusive methods of force feeding.

## II. Eighth Amendment

The Supreme Court has held that the government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A person may bring a claim for violations of the Eighth Amendment if the government fails to provide such care. To establish an Eighth Amendment violation, a person must establish that the Defendants acted with deliberate indifference to his serious medical needs. *Id.* "[M]ere disagreement as to the proper medical treatment" is likewise insufficient to establish deliberate indifference for purposes of an Eighth Amendment violation. *Monmouth County Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

Therefore, Mr. Fattah cannot argue that his force feeding through a nasalgastric tube constitutes deliberate indifference on the part of the medical staff. In this case, he has asserted mere disagreement with the methodology of his feeding. This disagreement does not rise to the level of an Eighth Amendment violation. Therefore, a defense on the basis of the Eighth Amendment must also fail.[1]

---

[1] Mr. Fattah filed a brief (Doc. 16) on this date, July 8, 2008. The brief suggests that Mr. Fattah suffers from an eating disorder, which Mr. Fattah plans to establish by medical testimony. Mr. Fattah also seeks to establish through medical testimony as well as a preexisting state court order that any feeding should be conducted by use of the J-Tube. There is no evidence to support these suggestions in the record currently. Therefore there has been no consideration of these issues in arriving at this decision.

## III. Conclusion

**NOW,** this 8th day of July 2008, **IT IS HEREBY ORDERED THAT** the Court's Order of June 6, 2008 (Doc. 2) shall **REMAIN** in full force and effect.

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge